# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 26

### OCTOBER TERM, A.D. 2021

### February 18, 2022

JOHN DAVID MORRISON,

Appellant
(Defendant),

v.

PEGGY SUE RUBIO
f/k/a PEGGY SUE MORRISON,

Appellee
(Plaintiff).

S-21-0126

*Appeal from the District Court of Natrona County*
*The Honorable Kerri M. Johnson, Judge*

*Representing Appellant:*
> Hampton M. Young, Jr., Law Office of Hampton M. Young, Jr., PC, Casper, Wyoming.

*Representing Appellee:*
> Keith R. Nachbar, Keith R. Nachbar, P.C., Casper, Wyoming.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

\*Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    John Morrison (Husband) and Peggy Morrison[1] (Wife) divorced after five years of marriage.  Husband appeals the district court's division of marital property.  He contends that the district court abused its discretion when it awarded an inequitable and impermissibly punitive equalization payment to Wife.  We affirm.

*ISSUE*

[¶2]    Husband raises two issues, which we restate as one:

> Did the district court abuse its discretion in its division of marital property?

*FACTS*

[¶3]    Husband and Wife started dating in May 2014.  After dating six months, Wife moved in with Husband, living with him and two of his three children, including a teenage son.  Husband and Wife started team truck driving in June 2015 and married in October 2015.  In 2016, they decided Wife would stay home to allow Husband's teenage son, who often traveled on the road with them, to attend high school.  Husband continued to drive truck.  Wife cared for the teenager and renovated the house.  Renovations included replacement of interior doors, installation of wood flooring on the main level and carpet upstairs, renovation of the bathrooms, and outdoor landscaping.  After about a year, Husband quit truck driving and took an oil field job with Patterson-UTI Energy, Inc. (Patterson) where he worked for roughly two and a half years.

[¶4]    Husband and Wife made plans to sell the house, move into a fifth wheel trailer, and return to team truck driving.  Husband testified that he borrowed $56,851 in July 2019, to further improve the house in anticipation of selling it.[2]  None of the funds were used for additional house renovations.  Husband said that the bank required him to resolve outstanding credit obligations before allowing any of the money to be used for home improvements.  The record was not clear as to whether these obligations were for joint or individual debt.  Husband gave Wife $9,950 and used $5,000 to purchase a motorcycle trailer. Husband claimed Wife's unauthorized withdrawals from his account depleted any remaining money.  Shortly after obtaining the loan, Husband left his job at Patterson.  He testified that he was laid off; Wife testified that he quit.

---

[1] Peggy Morrison is also known as Peggy Sue Rubio.
[2] Both Husband and Wife signed the loan agreement.  Husband testified that the bank required Wife to sign as an obligor on the loan even though the deed was in his name only.

[¶5]   Wife had hip replacement surgery on October 8, 2019.  That same day, Husband withdrew $22,772.67 from his Patterson retirement account, closing it.  He testified that he planned to use the retirement monies to support himself and Wife after losing his job.  Wife claimed she did not know Husband had cashed out his retirement account, and she did not receive any money from it.  While the exact date is unclear, around this same time, Husband sold the house, but the sale had not closed.

[¶6]   Wife spent several days in the hospital before returning to the house to continue recovery.  She was taking medications that made her groggy and caused her to sleep for long periods of time.  While she recuperated, Husband and family friend, Raina Wendling (a dealer in used furniture), started packing the house.

[¶7]   Those items intended for the yet unpurchased fifth wheel and other items that Ms. Wendling bought from the couple were moved to Ms. Wendling's furniture warehouse. Additional belongings designated as Wife's were moved to a storage unit rented in her name.  Husband testified that he knew at this time he was going to leave the marriage, and he separated his belongings from the rest.  Ms. Wendling testified that she witnessed Husband put these into his truck and none of them were stored at her warehouse.  Husband attested that all of Wife's belongings went either to Wife's storage unit or Ms. Wendling's furniture warehouse.  After everything was moved, Husband and Wife stayed at a motel for four days until the sale of the house closed.

[¶8]   On closing the sale of the house, Husband received $50,204.89.  He used some of this money to purchase a fifth wheel trailer ($30,000) and deposited the remainder ($20,204.89) into his separately held bank account.  Husband and Wife then retrieved the items stored in Ms. Wendling's warehouse and moved into the fifth wheel trailer.  Shortly thereafter, Husband left in the middle of the night and never returned.  He drove to California to see his children and to Arizona to look for a job.  He rented a storage unit in Arizona and put his belongings there.  On November 18, 2019, Wife filed for divorce.

A.     Bench Trial

[¶9]   The district court held a two-day bench trial in January 2021.  The parties presented conflicting testimony on their property, its location, and its value.  The parties disputed ownership of the marital home.  Husband asserted that he purchased the house in 2008 and was listed as the sole owner.  He argued that Wife was not entitled to any proceeds from its sale.  Wife testified to the significant improvements she had made to the house and argued she was entitled to half the equity.

[¶10]  The parties also contested the location and ownership of certain personal property. Wife testified Husband took many of her personal belongings including items on which

2

she placed a high value.[3]  Among these, she claimed he took $20,000 in cash that she had inherited from her father; a safe containing her jewelry (she valued at $20,000); a log bedroom set (she valued at $8,000); a bear head statue (she valued at $700); and a mountain lion statue (she valued at $1,200).

[¶11]  Husband explained he left in the middle of the night because Wife pointed a gun at him and threatened to shoot him unless he paid for COBRA[4] insurance.  He testified that when he left, he took only his personal belongings.  He maintained that the safe containing the jewelry and Wife's inheritance was under the bed in the fifth wheel trailer, and he left it there.  As to the log bedroom set, Wife gave conflicting evidence on the proceeds from its sale.  Her demonstrative trial exhibit indicated Husband sold it to Ms. Wendling and kept the money.  She, initially, testified that she did not know what happened to the money and later said that the $800 was used to pay for the motel room where the couple stayed while waiting to move to the fifth wheel.  Ms. Wendling testified that she sold the log bedroom set on consignment at her furniture store for $800.  She was not asked what happened to the proceeds.

[¶12]  There was conflicting testimony regarding the two animal statues.  Wife testified that Husband sold the two animal statues to her ex-husband, Don Bower, and kept the money.  Mr. Bower, contradicting her testimony, said that he bought both statues from Wife for $300 when she told him she needed money.  He did not know where the money went after he gave it to Wife.

[¶13]  Husband testified that he "was very careful separating everything in the house" while packing, and he did not take any of Wife's belongings.  The court questioned this testimony because Husband was unwilling to disclose where these possessions were located.  Both Wife's attorney and the court pressed Husband to reveal the city and state where he took his things.  Husband eventually disclosed that he kept his belongings in a storage facility in Kingman, Arizona.  He initially testified that he could not remember the name or address of the storage facility, but after a break in the proceedings, he provided the name.

## B.    Decree of Divorce

[¶14]  The district court entered a Decree of Divorce on February 11, 2021.  The district court found Wife more credible than Husband.  The court did not believe Husband's assertion that he left in the middle of the night because Wife threatened to shoot him.

---

[3] Wife submitted an exhibit identifying missing items including a big bear rug, knife collection, coin collection, and antique furniture.

[4] The Consolidated Omnibus Budget Reconciliation Act, or COBRA, is a law that gives workers and their families the right to keep their employer's group health plan after that insurance would end due to job loss, reduction of hours, or changes in the immediate family.  U.S. Dep't of Lab., *Continuation of Health Coverage (COBRA)*, https://www.dol.gov/general/topic/health-plans/cobra (last visited Feb. 16, 2022).

Instead, it found Wife's testimony—she did not know Husband planned on leaving and thought he had just gone to the store—more persuasive. The court did not credit Husband's claim that he had left the safe and other missing marital items with Wife "given the lengths to which [Husband] went to secrete all of his other property away from [Wife] and conceal his departure." It found:

> After [Husband] left, he moved the items into a storage facility in Arizona, the name and location of which was not discovered until he was forced to disclose the same at trial. This demonstrates to the [c]ourt the surreptitious nature of [Husband's] activities at the end of this marriage, and his desire to gain an advantage over [Wife] in the division of their property.

The court further questioned Husband's credibility because "[Husband] denie[d] that many of the items [on Wife's proposed final property distribution spreadsheet] exist, however, he also denied that he had items concealed until he was forced by the [c]ourt to answer questions regarding this issue."

[¶15] The district court found the liquid assets in the marital estate included the proceeds from the sale of the parties' home, the funds from Husband's retirement account, and the money from the loan. Regarding the physical assets, the court awarded Wife the fifth wheel trailer, the couple's 2007 Chevy Suburban, and a Mossberg 500 12-gauge shotgun. The court ordered Husband to return all Wife's items he had in his possession. Husband received the 2014 custom Harley Davidson, the motorcycle trailer, a 2006 Dodge Ram 2500, a 1999 Buick LeSabre, an ATV, and cable boxes. Regarding division of debt, the court assigned Wife all the debt incurred after the separation. The court ordered Husband to pay Wife a $65,000 equalization payment. Husband timely appealed the divorce decree, claiming the district court abused its discretion by making credibility determinations that were not based on substantial evidence and in awarding Wife an inequitable and punitive equalization payment.

## STANDARD OF REVIEW

[¶16] The "[d]isposition of marital property is 'committed to the sound discretion of the district court.'" *Snyder v. Snyder*, 2021 WY 115, ¶ 7, 496 P.3d 1255, 1257 (Wyo. 2021) (quoting *Begley v. Begley*, 2020 WY 77, ¶ 20, 466 P.3d 276, 283 (Wyo. 2020)). "We review the district court's property disposition for an abuse of discretion." *Innes v. Innes*, 2021 WY 137, ¶ 16, 500 P.3d 259, 262 (Wyo. 2021). The primary consideration is "whether the district court could reasonably conclude as it did." *Malli v. Malli*, 2020 WY 42, ¶ 14, 460 P.3d 245, 249 (Wyo. 2020) (citing *Porter v. Porter*, 2017 WY 77, ¶ 12, 397 P.3d 196, 198 (Wyo. 2017)). "A court abuses its discretion when 'the property disposition shocks the conscience of this [C]ourt and appears to be so unfair and inequitable that

4

reasonable people cannot abide it.'" *Long v. Long*, 2018 WY 26, ¶ 22, 413 P.3d 117, 125 (Wyo. 2018) (quoting *Kummerfeld v. Kummerfeld*, 2013 WY 112, ¶ 7, 309 P.3d 822, 824 (Wyo. 2013)); *see also Conzelman v. Conzelman*, 2019 WY 123, ¶ 15, 453 P.3d 773, 778 (Wyo. 2019).

[¶17] In evaluating the sufficiency of the evidence, "we consider only the evidence in favor of the successful party, ignore the evidence of the unsuccessful party, and grant to the successful party every reasonable inference that can be drawn from the record." *Malli*, ¶ 14, 460 P.3d at 249 (quoting *Porter*, ¶ 12, 397 P.3d at 198). "We will not disturb a property division in a divorce case, except on clear grounds, as the trial court is usually in a better position than the appellate court to judge the parties' needs and merits of their positions." *Snyder*, ¶ 7, 496 P.3d at 1257 (quoting *Metz v. Metz*, 2003 WY 3, ¶ 6, 61 P.3d 383, 385 (Wyo. 2003)); *see also Johnson v. Johnson*, 2020 WY 18, ¶ 22, 458 P.3d 27, 36 (Wyo. 2020). "The trial judge is in the best position to assess the credibility of witnesses and weigh their testimony[.]" *Drake v. McCulloh*, 2002 WY 50, ¶ 18, 43 P.3d 578, 584 (Wyo. 2002). "Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence." *Meiners v. Meiners*, 2019 WY 39, ¶ 8, 438 P.3d 1260, 1266 (Wyo. 2019) (quoting *Galiher v. Johnson*, 2018 WY 145, ¶ 6, 432 P.3d 502, 507 (Wyo. 2018)).

## *DISCUSSION*

[¶18] Husband claims the district court abused its discretion when it unreasonably resolved credibility issues against him and impermissibly punished him by awarding an inequitable equalization payment that cannot be supported by the marital estate. Husband also argues that the district court abused its discretion because the property division and equalization payment were unfairly punitive.

[¶19] The disposition of property in a divorce is governed by Wyo. Stat. Ann. § 20-2-114(a) which states:

> [I]n granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children.

Wyo. Stat. Ann. § 20-2-114(a) (LexisNexis 2021); *Innes*, ¶ 15, 500 P.3d at 262. "There are no specific guidelines as to the weight the district court must afford the statutory considerations when making a property division." *Innes*, ¶ 15, 500 P.3d at 262 (quoting *Malli*, ¶ 16, 460 P.3d at 249). The statute contemplates a distribution that is equitable, it

5

"does not require an equal division of property." *Malli*, ¶ 16, 460 P.3d at 249. We have recognized that, "[a] just and equitable division of property is just as likely not to be equal." *Long*, ¶ 22, 413 P.3d at 125 (quoting *Kummerfeld*, ¶ 10, 309 P.3d at 825); *see also Porter*, ¶ 15, 397 P.3d at 198. The equity of the district court's property division is evaluated "from the perspective of the overall distribution rather than from a narrow focus on the effects of any particular disposition." *Innes*, ¶ 17, 500 P.3d at 262 (quoting *Stevens v. Stevens*, 2014 WY 23, ¶ 11, 318 P.3d 802, 807 (Wyo. 2014)).

## A.     Credibility

[¶20]   We first address Husband's argument regarding credibility. Husband contends that the district court abused its discretion by discounting the entirety of his testimony for credibility reasons, while, at the same time, ignoring Wife's credibility issues.

[¶21]   Husband asserts that the record established that Wife committed perjury and lied to the court about what happened to a log bedroom set and two animal statues. As recounted above, Wife testified inconsistently about what happened with the $800 from the log bedroom set. Wife claimed that Husband sold two animal statues and the log bedroom set keeping the money. Mr. Bower contradicted Wife's testimony on the statues testifying that he purchased them directly from her for $300.

[¶22]   We agree that the record reveals inconsistencies in Wife's testimony. It also shows that the district court did not ignore these inconsistencies. Instead, it found that "both parties presented . . . credibility issues in one regard or another." The court, without expressly citing to Wife's inconsistent testimony in its divorce decree, noted "the confusing and convoluted nature of the evidence." "[I]ssues of credibility and the weight to be given to testimony are matters to be resolved by the trier of fact, not an appellate court. Thus, we may not substitute our judgment for that of a trial court with respect to issues concerning credibility." *Wallop v. Wallop*, 2004 WY 46, ¶ 10, 88 P.3d 1022, 1025 (Wyo. 2004) (citing *Carlton v. Carlton*, 997 P.2d 1028, 1035 (Wyo. 2000)).

[¶23]   Husband asks us to do what our standard of review precludes—"to reweigh the evidence and give all favorable inferences to the evidence supporting Husband's position." *Campbell v. Hein*, 2013 WY 131, ¶ 14, 311 P.3d 165, 168 (Wyo. 2013). While Wife's inconsistent statements are troubling, they are but one piece of the puzzle. The record demonstrates that the district court assessed the testimony offered by key witnesses including Husband and Wife. The court weighed the credibility of the parties and the witnesses and explained its view including its finding that Husband's testimony was less credible. "We decline to disturb the [district] court's credibility rulings"—where they are supported by substantial evidence. *Hays v. Martin*, 2021 WY 107, ¶ 28, 495 P.3d 905, 911–12 (Wyo. 2021) (citing *Boyce v. Jarvis*, 2021 WY 80, ¶ 30, 490 P.3d 320, 326 (Wyo. 2021)).

6

## B. Equalization Payment

[¶24] Husband argues that the equalization payment is inequitable because there are insufficient marital assets to satisfy the payment. We addressed a similar argument in *Snyder*.

[¶25] In *Snyder*, as part of its property distribution, the district court ordered Mr. Snyder to pay Mrs. Snyder an equalization payment of $100,000. *Snyder*, ¶ 4, 496 P.3d at 1257. On appeal, Mr. Snyder argued that the district court abused its discretion because "the evidence show[ed] there [were] no assets in the marital estate to use to make the payment, and the district court improperly 'created wealth where it does not exist.'" *Id.* ¶ 17, 496 P.3d at 1259. We affirmed explaining, "it is not unusual for courts to require a cash equity payment from one spouse to the other even though there is insufficient cash in the marital estate to cover it." *Id.* (citing *Bagley v. Bagley*, 2013 WY 126, ¶ 28, 311 P.3d 141, 150 (Wyo. 2013)).

[¶26] Here, as in *Snyder*, it does not amount to an abuse of discretion for the court to award one spouse an equalization payment even though there are insufficient funds in the marital estate. *Snyder*, ¶ 17, 496 P.3d at 1259. "We have, in other cases, approved cash awards to spouses despite the fact that there was insufficient cash in the marital estate to cover the judgment." *Bagley*, ¶ 28, 311 P.3d at 150 (citing *Boyle v. Boyle*, 2006 WY 124, ¶¶ 21–23, 143 P.3d 368, 374 (Wyo. 2006); *Humphrey v. Humphrey*, 2007 WY 72, 157 P.3d 451 (Wyo. 2007)). We also point out that the "dissipation of marital assets may be accounted for by the court in a subsequent property division." *Bagley*, ¶ 27, 311 P.3d at 150. There was nothing improper about the district court's award of an equalization payment.

## C. The Equalization Payment Was Unfairly Punitive

[¶27] Finally, Husband argues that the equalization payment demonstrates that the district court intended to punish him.

[¶28] "[W]hen making a property division, the trial court in its discretion may consider the fault of the respective parties, but the division must not be done with the intent to punish one of the parties." *Breitenstine v. Breitenstine*, 2003 WY 16, ¶ 17, 62 P.3d 587, 592 (Wyo. 2003) (citing *Carlton*, 997 P.2d at 1034). "Generally, evidence of an intent to punish a party can be found in an unjust or inequitable property division." *Id.* ¶ 17, 62 P.3d at 592 (citing *Beckle v. Beckle*, 452 P.2d 205, 208 (Wyo. 1969)).

[¶29] Husband asks us to presume the court intended to punish him based on its distribution of assets, debts, and an impermissibly punitive equalization award. *See, e.g., Hall v. Hall*, 2002 WY 30, ¶ 15, 40 P.3d 1228, 1230 (Wyo. 2002) (rejecting a similar argument). The divorce decree reflects that the court weighed the distribution of the liquid

and physical assets in determining Husband should be required to make a $65,000 payment to equalize the distribution of the marital estate. The court arrived at the equalization payment after considering "the . . . loan, the retirement funds, [Wife's] $20,000 inheritance, the debt's assigned to [Wife], and the property not specifically distributed by [the] order."

[¶30] The district court considered "the requirements of Wyo. Stat. [Ann.] § 20-2-114 including the length of the marriage, the respective merits and credibility of both parties and the condition the parties will be left in by the divorce." The record demonstrates that the district court could reasonably conclude as it did, and its division of property including the equalization payment does not "shock[] the conscience of this court." *Begley*, ¶ 20, 466 P.3d at 283 (quoting *Long*, ¶ 22, 413 P.3d at 125); *Malli*, ¶ 14, 460 P.3d at 249. The district court did not abuse its discretion.

## *CONCLUSION*

[¶31] The district court did not abuse its discretion in its disposition of marital property. We affirm.